**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x     FOR PUBLICATION

In re:

                                                                         CHAPTER 15
ATLAS SHIPPING A/S, a Danish Corporation,

                                                                         Case No: 09-10314
                                                                         Jointly Administered

                                   Foreign Debtor.


-------------------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER GRANTING FOREIGN
## REPRESENTATIVE'S MOTION FOR ADDITIONAL RELIEF

*A P P E A R A N C E S:*

James F. Sweeney
Nicoletti Hornig & Sweeney
Wall Street Plaza
88 Pine Street, 7th Floor
New York, NY 10005
*Attorneys for Atlas Shipping A/S*

Thomas L. Tisdale
Tisdale Law Offices LLC
24 West 40th St. 17th Floor
New York, NY 10018
*Attorneys for Dormin Shipping S.A. & New Era Shipping, Inc.*

Jeremy J.O. Harwood
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
*Attorneys for Allied Maritime, Inc.*

Peter Scoufalos
Brown, Gavalas & Fromm LLP
355 Lexington Avenue
New York, NY 10017
*Attorneys for Malena Shipping Co.*

**MARTIN GLENN**
**United States Bankruptcy Judge**

The Court in this case is asked to vacate nine Supplemental Rule B maritime attachments obtained in the United States District Court for the Southern District of New York by foreign creditors of Atlas Shipping A/S and Atlas Bulk Shipping AS (together "Atlas"), two Danish corporations that are debtors in a bankruptcy proceeding in Denmark and, through their foreign representative, petitioners in a Bankruptcy Code chapter 15 proceeding in this Court. The Court is also asked to entrust the garnished funds to the foreign representative for administration in the Danish bankruptcy proceeding. The maritime attachments were issued in support of arbitrations commenced by Atlas' creditors in London pursuant to provisions of applicable maritime charters.

Under the former Bankruptcy Code § 304 regime for ancillary U.S. bankruptcy proceedings, case law clearly supports granting a foreign representative the relief sought here. The objecting foreign creditors argue that under the new chapter 15 regime, the relief sought could only be granted if the foreign representative also commenced a case under chapters 7 or 11. For the reasons explained below, the Court rejects the creditors' arguments and concludes, consistent with principles of comity, that the Supplemental Rule B attachments should be vacated pursuant to Bankruptcy Code §§ 1521(a)(5) and 1521(b), and the garnished funds turned over to the foreign representative subject to administration in the Danish bankruptcy proceeding.

## BACKGROUND

Atlas is an international shipping company based in Copenhagen, Denmark. On December 17, 2008, Atlas filed a bankruptcy petition in Denmark, and was declared a bankrupt by the Danish court on December 18, 2008. The Danish court then appointed

Lisa Bo Larsen and Michael Ziegler as trustees of Atlas. Under Danish law, once Atlas was declared bankrupt, all of Atlas' assets vested in the trustees. Danish law also provides for a stay—similar to the automatic stay under the U.S. Bankruptcy Code—of all proceedings involving Atlas. Finally, Danish law provides that all existing attachments lapse upon commencement of the bankruptcy, and no further attachments may be levied against the company's assets.

Between early November[1] and late December 2008, a number of Atlas's alleged creditors sought and obtained Rule B attachments against Atlas' funds found in banks in New York. The dates and attaching parties are as follows:

| DATE | ATTACHING PARTY |
|---|---|
| November 3, 2008 | Dormin Shipping |
| November 13, 2008 | Limankoy |
| December 18, 2008 | Amanda Navigation |
| December 19, 2008 | Sertio Shipping |
| December 22, 2008 | Allied Maritime |
| December 22, 2008 | New Era Shipping |
| December 22, 2008 | Cargill International |
| December 23, 2008 | Peninsula Petroleum |
| December 29, 2008 | Malena Shipping |

As a result of these attachments, approximately $4.3 million of Atlas' funds were restrained. None of the above creditors is based in the United States. The first two attachments were obtained before the Danish bankruptcy proceeding was commenced; the remaining seven attachments were obtained after the Danish bankruptcy was commenced. While the legal analysis of the validity of the attachments differs depending

---

[1] There is some dispute over the date of the first attachment. One set of papers lists the date as October 31, 2008, while another lists it as November 3, 2008. The difference is not material to the outcome of this Opinion.

on whether the attachments were obtained before or after the Danish bankruptcy commenced, the result here is the same—namely, all of the attachments shall be vacated and the funds entrusted to the foreign representative for administration in the Danish bankruptcy proceeding.

On January 23, 2009, Lisa Bo Larsen, the duly-appointed foreign representative of Atlas filed chapter 15 petitions (now jointly administered) in this Court. On January 27, 2009, the Court granted provisional relief pursuant to Bankruptcy Code § 1519(a) pending the recognition hearing. (ECF Docs. # 7, 8.) The provisional relief required that the garnished funds be turned over to the foreign representative's U.S. counsel, to be held in escrow pending determination of the parties' respective rights in those funds. On February 20, 2009, the Court granted recognition of the Danish proceeding as a foreign main proceeding pursuant to Bankruptcy Code § 1517. (ECF # 22.) During the recognition hearing, no creditors objected to recognition of the Danish bankruptcy proceeding as a foreign main proceeding, but several creditors—including the two objecting creditors here, Dormin Shipping and Allied Maritime (the "Objecting Creditors")—objected to the request of Atlas' foreign representative for additional discretionary relief pursuant to § 1521 to vacate the attachments and turn the escrowed funds over to the representative to be administered in the Danish bankruptcy proceeding. The Objecting Creditors argued that the attachments could be vacated only if Atlas' foreign representative first commenced a case under chapters 7 or 11 of the Bankruptcy Code, and then commenced and obtained judgment in an avoidance action under § 547.[2]

---

[2] Since the Supplemental Rule B maritime attachments were obtained by Atlas' creditors between November 3, 2008, and December 29, 2008, it is unlikely that the foreign representative could set them aside as avoidable preferences under § 547 in a case under chapters 7 or 11 because the 90-day avoidance

The Court directed further briefing on the issues and scheduled a further hearing for March 25, 2009.

**DISCUSSION**

*A.    Maritime Attachment Liens*

The maritime attachment lien is an ancient device that predates the grant of general admiralty jurisdiction to federal courts and that the Rules Enabling Act formalized in the admiralty rules. Maritime attachment liens are now governed by Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions to the Federal Rules of Civil Procedure ("Supplemental Rules").

Historically, Rule B attachments served two purposes: (1) they ensured satisfaction if a suit against the shipping company is ultimately successful; and (2) they ensured a defendant's appearance in an action. *Aurora Maritime Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 48 (2d Cir. 1996). Because shipping-company assets can be far-flung around the world, the liens are intended to maintain the status quo until the dispute can be litigated. *Id.*; *see also DSND Subsea AS v. Oceanographia, S.A. de CV*, 569 F. Supp. 2d 339, 348 (S.D.N.Y. 2008).

Under Supplemental Rule B, a plaintiff may obtain an order of attachment against a defendant's property that is in the hands of a garnishee. FED. R. CIV. P. SUPP. R. B(1)(a). Once the property has been restrained, Supplemental Rule E(4)(f) provides the defendant with an opportunity to appear before the court to contest the attachment. FED. R. CIV. P. SUPP. R. E(4)(f). Rule E(4)(f) does not by itself establish the test a district court should apply in vacating a Rule B attachment. The Second Circuit, adopting the

---

period has lapsed; all of these attachments could have been avoided if a case under chapters 7 or 11 had been filed when the chapter 15 petitions were filed.

practice in the Southern and Eastern Districts of New York (embodied in former Local Rule 12), has set out standards for issuing and then vacating maritime attachments. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 444 (2d Cir. 2006). In the Second Circuit, "in addition to having to meet the filing requirements of Rules B and E, an attachment should issue if the plaintiffs shows that 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Id.* at 445; *see also Proshipline Inc. v. Aspen Infrastructures Ltd.*, 533 F. Supp. 2d 422, 426 (S.D.N.Y. 2008). Conversely, a court may vacate an attachment "if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." *Aqua Stoli*, 460 F.3d at 445.

In more recent times, litigants have deployed Rule B attachments to attach bank credits used in electronic fund transfers ("EFTs") to or from parties absent from the jurisdiction. *Aqua Stoli*, 460 F.3d at 436. Before *Aqua Stoli* was decided, some courts criticized this practice, as it "work[ed] an unfairness to litigants because EFTs to or from them can be attached despite the litigants' having no connection to the district at all, save that they happened to be a participant in a wire transfer of U.S. dollars." *Id.* at 445 (citing *Seaplus Line Co. v. Bulkhandling Handymax AS*, 409 F. Supp. 2d 316, 320 (S.D.N.Y. 2005)). Nevertheless, the use of Rule B attachments to restrain EFTs has exploded recently. Increasing financial distress of the worldwide shipping industry has resulted in

increased use of Rule B attachments. In fact, one news account estimated that Rule B attachments accounted for 10-30% of all monthly filings in the Southern District of New York in the second half of 2008. Greg Miller, *Rule B Deluge Floods New York Court*, FAIRPLAY, at p. 8 (Jan. 22, 2009), www.fairplay.co.uk. Statistics from the District Court for the Southern District of New York show that, for calendar year 2008, Rule B attachments comprised 16.4% of civil case filings.

All nine attachments here were obtained before the chapter 15 petitions were filed in this Court. Neither Atlas nor the foreign representative sought to vacate the Rule B attachments in the district court under Rule E(4)(f).

B.      *Granting Comity to Foreign Proceedings under § 304 of the Old Code*

In 2005, Congress adopted chapter 15 of the Bankruptcy Code, which is based on the Model Law on Cross-Border Insolvency promulgated by the United Nations Commission on International Trade Law in 1997. Chapter 15 replaced § 304, which originally provided the statutory framework for cases filed in the United States that are ancillary to insolvency proceedings filed in foreign countries. The philosophies underlying former § 304 were deference to the foreign proceeding and the prevention of the piecemeal distribution of the debtor's estate. *See Bank of New York & JCPL Leasing Corp. v. Treco (In re Treco)*, 240 F.3d 148, 153−54 (2d Cir. 2001) (citing *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag)*, 961 F.2d 341, 358 (2d Cir. 1992); *Cunard S.S. Co. Ltd v. Salen Reefer Servs. AB*, 773 F.2d 452, 455 (2d Cir. 1985)). Section 304 provided a bankruptcy court with broad discretion in fashioning an appropriate remedy in a particular case. *Id.* at 154−55. Section 304(c) outlined several

factors, including comity, that a court must consider before granting a foreign representative any type of relief.

"Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) (citing *Hilton v. Guyot*, 159 U.S. 113, 202−03 (1895)); *see also Cunard S.S. Co. Ltd v. Salen Reefer Servs. AB*, 773 F.2d 452 (2d Cir. 1985). "Comity takes into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *In re Artimm, S.R.L.*, 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005) (citing *Maxwell Commc'ns Corp. v. Societe Generale (In re Maxwell Commc'ns Corp.)*, 93 F.3d 1036, 1048 (2d Cir. 1996)). Particularly in the bankruptcy context, "American courts have long recognized the need to extend comity to foreign bankruptcy proceedings," because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Victrix*, 825 F.2d at 713−14. As a result, courts in the Second Circuit "have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding." *J.P. Morgan Case Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005).

The foreign representative argues that this Court should grant comity to the Danish bankruptcy proceeding by applying provisions of the Danish Bankruptcy Act that, according to the foreign representative, would dissolve all pre- and post-petition

attachments as a matter of law.  The foreign representative (1) filed a notice of intent to

rely on foreign law (pursuant to Federal Rule of Civil Procedure 44.1), stating her

intention to rely on a portion of the Bankruptcy Act of the Kingdom of Denmark (*see*

ECF Doc. # 19), (2) provided the Declaration of Trustee Lisa Bo Larsen, dated March 3,

2009, setting forth her opinion about the content and effect of Danish law regarding the

attachments (*see* ECF Doc. # 23, Supplement Declaration of Lisa Bo Larsen), and (3)

attached a portion of the Act (in Danish) and a certified English translation (*Id.*, Exs. A &

B).

> Sections 31(1) and 31(3) of the Danish Bankruptcy Act provide as follows:

> > 31. – (1) Upon pronouncement of adjudication order
> > execution by way of distress or attachment shall not be
> > levied against the assets comprised by the bankruptcy.
> > . . .
> > 31. – (3) Any attachments made before the
> > bankruptcy shall lapse.

*Id.*, Ex. B.

> The foreign representative also attached a letter addressed to the Court from Judge

Torben Kuld Hansen, the presiding judge over the Danish proceeding.  Judge Hansen

wrote:

> > As presiding judge in the bankruptcy proceeding of
> > Atlas Shipping A/S and Atlas Bulk Shipping AS (jointly
> > referred to as "Atlas"), which proceedings were
> > commenced by this court on 18 December 2008 (the
> > "Bankruptcy Date"), I write to request your court's
> > recognition and acceptance of Danish law regarding
> > dissolution of attachments of Atlas' property.
> > Under Chapter 4 of the Danish Bankruptcy Act,
> > attachments of Atlas' property cannot be made after the
> > Bankruptcy Date, cf. Section 31(1), and any and all
> > attachments of Atlas' property made before the Bankruptcy
> > Date, automatically lapses as of the Bankruptcy Date, cf.
> > Section 31, (3).

> In order to provide for the orderly and efficient administration and disposition of the Atlas estate, and in the interests of international comity, this Court asks that you recognize and effectuate the Danish Bankruptcy Act.

(ECF Doc. # 23, Sweeney Declaration Ex. A.)

The Objecting Creditors had sufficient notice of the foreign representative's intent to rely on Danish law.[3] The Objecting Creditors did not file any objection to the Rule 44.1 notice; nor did they proffer any contrary evidence regarding Danish substantive law. Thus, the foreign representative's evidence of foreign law is unrebutted.[4]

There is little doubt that under § 304 and the Second Circuit's decision in *Cunard* and its progeny, the Rule B attachments would be dissolved as a result of the Court exercising its discretion and granting comity to the Danish proceedings. Section 304 specifically permitted a court to order turnover of the foreign debtor's property, provided that such turnover was consistent with principles of comity. 11 U.S.C. §§ 304(b)(2), 304(c); *see generally Altos Hornos*, 412 F.3d at 425; *Koreag*, 961 F.2d at 349.[5] The Second Circuit's decision in *Cunard* also supports a finding that such turnover would in fact comport with principles of comity. In *Cunard*, Salen, a Swedish company, filed a

---

[3] In addition to the Notice of Intent filed on ECF on February 24, 2009, counsel for the foreign representative stated such intent at a hearing on February 20, 2009.

[4] The Objecting Creditors argue that § 31 of the Danish Bankruptcy Act should not be given extraterritorial effect. They did not offer evidence on this issue of Danish law. Indeed, other countries' foreign laws are often given extraterritorial effect by U.S. courts. *See Adinolfi v. Empire Marble & Granite, Inc. (In re Rosacometta, S.r.l.)*, 336 B.R. 557, 564 (Bankr. S.D. Fla. 2005) (recognizing Italy's automatic stay in ancillary proceeding in the U.S., and ordering avoidance of garnishment). In light of the Court's disposition in this case, the Objecting Creditors will be free to make this argument before the court in Denmark.

[5] In *Koreag*, the Second Circuit held that while ordinarily a court will order turnover to a foreign representative in deference to the foreign proceeding, if there is a bona fide dispute regarding the title of the assets to be turned over, the court must first make a threshold determination regarding ownership. 916 F.2d at 348. The Second Circuit in *Altos Hornos* clarified that the *Koreag* "exception" applied to all disputes of property ownership in the § 304 context, not just those raised in the turnover context. 412 F.3d at 426. Here, however, there is no dispute that the restrained funds belong to Atlas; the only question is the parties' respective rights in the funds. The *Koreag* "exception" is therefore inapplicable to this case.

bankruptcy proceeding in Sweden.[6]  About two weeks later, Cunard obtained a Rule B attachment against Salen's bank accounts in New York in support of a London arbitration pursuant to the terms of a maritime charter.  Salen thereafter filed a motion seeking to dissolve the Rule B attachment.  Judge Sweet granted Salen's motion on the grounds that comity with the Swedish courts dictated that result.  *Cunard S.S. Co. Ltd v. Salen Reefer Servs. AB*, 49 B.R. 614, 618 (S.D.N.Y. 1985).  The Second Circuit affirmed the decision. After a lengthy discussion of the importance of comity to § 304, the court held that the district court properly recognized the Swedish court's insolvency ruling because Cunard could not show that Sweden was not a court of competent jurisdiction or that any public policy of the United States would be violated by the recognition of comity.  773 F.2d at 459−60.  Furthermore, Cunard was a general creditor of Salen and its attachment was filed after Salen filed its bankruptcy petition in Sweden.  The court found no compelling reason why a general creditor should receive a preference over other creditors just because it filed an attachment in another jurisdiction.  *Id.* at 459.

Similarly, in *In re Milovanovic*, 357 B.R. 250 (Bankr. S.D.N.Y. 2006), the court found that where under applicable foreign law attachments would be void, the court should void them under § 304 consistent with principles of comity.[7]  *Id.* at 356.  In *Milovanovic*, the foreign debtor bank was placed in insolvency under Serbian law in 2000.  In 2003, the debtor's liquidator filed a petition under § 304 to restrain disposition of $848,000 in the United States allegedly belonging to the debtor.  The liquidator also sought to have those funds transmitted abroad for administration in the foreign insolvency proceeding.  Nugent Establishment Industrie, F.L. ("Nugent") opposed the

---

[6]        Both *Victrix* and *Cunard* involved the same foreign debtors—Salen Reefer Services, A.B. and Salen Dry Cargo A.B.—and the same Swedish bankruptcy proceeding.  *See Victrix*, 825 F.2d at 712.

[7]        The debtor in *Milovanovic* filed its petition in 2003, before chapter 15 was adopted.

petition on the grounds that it had obtained a judgment against the debtor and that it had garnished the debtor's funds on deposit in a New York bank account before the petition was filed, but after the foreign liquidation commenced. Among the arguments Nugent advanced was that its garnishment accorded it the status of a secured creditor, and so the court could not order the funds transferred. The court rejected the argument, however, noting that foreign law, like U.S. law, prevented a creditor from attaching property to secure a pre-existing debt once a bankruptcy was commenced. *Id.* at 256. The court therefore held that it was "not required to recognize an attachment that would be void under applicable foreign law." *Id.* at 256−57.[8]

The foreign representative argues that *Cunard* supports granting comity to the Danish proceeding in this case and dissolving the Rule B attachments here. In both *Cunard* and in this case, the foreign courts entered orders determining that the debtors were insolvent. Neither the Swedish court in *Cunard* nor the Danish court in this case entered a judgment or order relating to the specific creditors' claims or the validity of the attachments obtained in the United States. The attachment in *Cunard* was obtained by the creditor after the foreign bankruptcy proceeding commenced. Likewise, seven of the attachments in this case were obtained after the Danish bankruptcy proceeding commenced. Section 31(1) of the Danish Bankruptcy Act clearly provides that no attachments may levy against the bankrupt's assets after bankruptcy is announced. Both *Cunard* and *Milovanovic* stand for the proposition that attachments that would be void under foreign law should not be accorded special status just because the foreign representative initiated an ancillary proceeding here. Both cases also stand for the

---

[8]     As is the case here, the court also specifically held that all of Nugent's rights in the foreign proceeding were reserved and its ruling was without prejudice to any arguments it wanted to make as part of the foreign proceedings.

proposition that in such circumstances, the attachments would be dissolved and the funds returned to the foreign forum without prejudice to any of the creditors raising arguments in the foreign proceedings. Therefore, unless the adoption of chapter 15 altered the principles of comity recognized in *Cunard* and *Milovanovic*, the Court would grant comity to the Danish proceedings and dissolve the seven attachments filed after the Danish bankruptcy was announced.

With respect to the two pre-Danish-bankruptcy attachments, while Danish law is less clear, the unrebutted evidence also supports dissolving these attachments. Section 31(3) of the Danish Bankruptcy Act provides that at the time of the bankruptcy all attachments lapse. While the Court questions whether the scope of § 31 of the Danish statute is as broad as the foreign representative makes it out to be, the fact that the two attachments were filed only weeks before the Danish bankruptcy commenced suggests that they would fall within the ambit of the statute. Furthermore, the letter from the presiding judge likewise supports the conclusion that any attachments against Atlas' assets—whether obtained before or after the Danish bankruptcy commenced—"lapsed" by operation of law. The Objecting Creditors had an opportunity to submit evidence to rebut the foreign representative's evidence regarding Danish law. They also could have cross-examined the foreign representative, who was present in court. They chose not to do so, and the Court is constrained to rule on the record before it. Based upon that record, application of Danish law would also result in the dissolution of the two pre-Danish-bankruptcy attachments as well. As a result, these two attachments will also be dissolved. *See Milovanovic*, 357 B.R. at 256−57.

Objecting Creditor Allied Maritime relies on the Second Circuit's earlier decision in *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512 (2d Cir. 1975), arguing that its facts support declining to give comity to the Danish proceeding. In *Fotochrome*, the creditor, Copal, commenced an arbitration in Japan prepetition and obtained an arbitration award post-petition. Fotochrome had commenced a bankruptcy proceeding in the Eastern District of New York, and obtained a stay against any actions, suits or arbitrations. The bankruptcy court did not have personal jurisdiction over Copal so the stay did not apply to the Japanese arbitration. *Id.* at 515. After prevailing in the arbitration, Copal filed a proof of claim in the bankruptcy court based on the amount of the arbitration award. *Fotochrome* is inapplicable to this case. It did not involve any attachments or the granting of comity to a foreign bankruptcy proceeding. The only issue was whether the foreign arbitration award was required by treaty or statute to be accorded finality with respect to the amount of Copal's claim in the bankruptcy case. The Second Circuit held that the arbitration award "is a valid determination on the merits and is unreviewable by the Bankruptcy Court." *Id.* at 517.

The Second Circuit's later decision in *Victrix*, 825 F.2d 709, casts even more substantial doubt on Allied Maritime's argument based on *Fotochrome* because, on the basis of comity to a foreign bankruptcy proceeding, the court refused to recognize a foreign judgment based on a foreign arbitration award. Judge Newman's reasoning is applicable here:

> American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings. The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail. Congress

implemented this policy by enacting section 304 as part of the Bankruptcy Reform Act of 1978. This provision allows foreign bankrupts to prevent piecemeal distribution of assets in this country by filing ancillary proceedings in domestic bankruptcy courts. Under general principles of comity as well as the specific provisions of section 304, federal courts will recognize foreign bankruptcy proceedings provided the foreign laws comport with due process and fairly treat claims of local creditors.

*Victrix*, 825 F.2d at 713−14 (citations omitted).

In words that equally apply to Allied Maritime's arguments, Judge Newman also wrote:

> However, different concerns bear on a case such as this one, which takes on a public character by virtue of Salen's insolvency and the institution of the Swedish bankruptcy proceeding. Any distribution of Salen's limited assets is likely to affect other creditors, not parties to the proceeding, who obeyed the Swedish court's stay and sought relief only in the bankruptcy proceeding. By attaching Salen's local assets after its declaration of bankruptcy, Victrix attempted to secure a "captive fund" to satisfy the anticipated arbitration award. We will not aid Victrix's effort to evade the writ of the Swedish bankruptcy court.
> Deference to the Swedish bankruptcy court is appropriate so long as the attached funds are subjected to the jurisdiction of that court. Salen makes no claim that the funds should be transferred to it. On the contrary, it requests that the funds be transferred to the liquidator to abide the orders of the bankruptcy court. It will then be up to the Swedish court to determine what benefit, if any, Victrix should enjoy from having obtained the London arbitration award and the British judgment and having asserted its claim against the attached funds.

*Id.* at 714−15 (citation omitted).

While *Victrix* dealt with an attachment obtained after the foreign bankruptcy proceeding commenced—as is true for the attachment that Allied Maritime obtained here—the court's reasoning applies to the two creditors who obtained their Rule B

attachments only a short time before the Danish bankruptcy proceeding commenced. Only one of those creditors—Dormin Shipping—has objected to the relief sought by the foreign representative. Dormin is free to argue to the Danish bankruptcy court that Dormin has a superior claim to the amount it successfully garnished before the Danish bankruptcy commenced.

Finally, the Objecting Creditors also assert that even if the Court grants comity to the Danish proceeding, the Rule B attachments should remain in force because comity is not one of the listed grounds for vacating a Rule B attachment under the Second Circuit's decision in *Aqua Stoli*, 460 F.3d at 436. But the application of comity very often has the effect of overriding domestic legal doctrines or rules. *See, e.g.*, *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 337 (S.D.N.Y. 2006) (recognizing Canadian order as an exercise of comity even though it overrode a defendant's constitutional right to a civil jury trial); *Triton Container Int'l Ltd. v. Cinave S.A.*, 1997 WL 634308, at *4 (E.D. La. Oct. 10, 1997) (granting comity to Argentine proceedings and vacating Rule B attachments).[9] The purpose of comity is to coordinate efforts with a parallel foreign proceeding; that may involve overriding domestic legal doctrines. *Victrix* likewise supports this relief even if a creditor has obtained a Rule B attachment (and even if it has already obtained an arbitration award and foreign judgment).

---

[9]     The foreign representative also cites to *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping*, 475 F. Supp. 2d 275, 285 (S.D.N.Y. 2006) for the proposition that comity is grounds for vacating a Rule B attachment even post-*Aqua Stoli*. The court in *Wajilam* considered comity as grounds for vacating the attachments at issue, but declined to exercise its discretion and apply the doctrine of comity under the facts presented.

C.      *Chapter 15 Relief Available Upon Recognition of a Foreign Main Proceeding*

1.      Chapter 15 Embodies Principles of Comity

As noted above, chapter 15 replaced § 304 as the Code's operative provisions for dealing with cross-border insolvencies. Nevertheless, many of the principles underlying § 304 remain in effect under chapter 15. Significantly, chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. This is evidenced by the pervasiveness with which comity appears in chapter 15's provisions. For example, § 1509 specifically requires that if the court grants recognition under § 1517, it "shall grant comity or cooperation to the foreign representative." 11 U.S.C. § 1509(b)(3). In addition, § 1507 also explicitly directs the court to consider comity in granting additional assistance to the trustee.

While recognition of the foreign proceeding turns on the objective criteria under § 1517, "relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008) (citing §§ 1507, 1521, and 1525). Once a case is recognized as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity. *See generally* Allan L. Gropper, *Current Devs. in Int'l Insolvency Law: A United States Perspective*, 15 J. BANKR. L. & PRAC. 2, Art. 3, at 3–5 (Apr. 2006) (hereinafter "Gropper").

There is a logical reason for this. "Deference to foreign insolvency proceedings will often facilitate the distribution of the debtor's assets in an equitable, orderly,

efficient, and systematic manner, rather than in a haphazard, erratic, or piecemeal fashion." *In re Artimm, S.r.l.*, 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005). Chapter 15 "mandate[s] that the court cooperate 'to the maximum extent possible' with a foreign court or representative . . . ." *Id*. at 159. In short, while chapter 15 replaced § 304 and provided a more structured framework for recognizing foreign proceedings, Congress specifically granted courts discretion to fashion appropriate post-recognition relief, consistent with the principles underlying § 304.

2.    Mandatory Relief Under § 1520

Section 1520 outlines the mandatory relief automatically granted upon recognition of a foreign main proceeding under chapter 15. Upon an order recognizing a proceeding as a foreign main proceeding, § 1520 makes §§ 361 and 362 applicable with respect to the debtor and property of the debtor within the jurisdiction of the United States. The statute refers to "property of the debtor" to distinguish it from the "property of the estate" that is created under § 541(a). In a chapter 15 case, there is no "estate"; nevertheless, § 1520(a) imposes an automatic stay on any action with respect to the debtor's property located in the United States. *See In re Pro-Fit Holdings Ltd.*, 391 B.R. 850, 864 n.48 (Bankr. C.D. Cal. 2008).

Once § 1520(a) applies, §§ 363, 549 and 552 also apply to any transfer of a debtor's interest in property within the United States. 11 U.S.C. § 1520(a)(2). Section 1520 also allows a foreign representative to operate a debtor's business by exercising the rights and powers of a trustee under sections 363 and 552; and it applies § 552 to property of the debtor that is within the territorial jurisdiction of the United States. 11 U.S.C. § 1520(a).

3. Discretionary Relief – Statutory Bases for Ordering Turnover of Assets to the Foreign Representative

In addition to the mandatory provisions under § 1520, two other provisions in chapter 15 are implicated in this case in that they allow the Court, in its discretion, to grant further relief to the foreign representative. Section 1521(a) outlines the discretionary relief a court may order upon recognition of a foreign proceeding, whether main or non-main. 11 U.S.C. § 1521(a). The discretion that is granted is "exceedingly broad" since a court may grant "any appropriate relief" that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors. Leif M. Clark, ANCILLARY & OTHER CROSS-BORDER INSOLVENCY CASES UNDER CHAPTER 15 OF THE BANKRUPTCY CODE, § 7[2], at 70 (2008) (hereinafter, "Clark").

The exercise of discretion is, however, circumscribed by the Bankruptcy Code. Section 1522(a) provides that the court may only grant discretionary relief under § 1521 if the interests of creditors are sufficiently protected. 11 U.S.C. § 1522(a). Section 1522(b) provides that the court may impose conditions on discretionary relief, such as the posting of security or a bond. 11 U.S.C. § 1522(b); *see also In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 636 (Bankr. E.D. Cal. 2006). If conditions change and the court decides to alter the conditions it imposed (or even impose conditions for the first time), § 1522(c) provides the authority to do so. 11 U.S.C. § 1522(c). "Standards that inform the analysis of § 1522 protective measures in connection with discretionary relief emphasize the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another." *Tri-Continental Exchange*, 349 B.R. at 637. "Congress explained . . . that the bankruptcy court was being given broad latitude to

mold relief to meet specific circumstances." *Id.* at 636−37 (citing legislative history). Considered together, §§ 1521 and 1522 give "the court . . . ample tools for dealing with the manner in which a chapter 15 case is administered." *Id.* at 638.

Section 1521 permits the court, in its discretion, to order the entrustment of a debtor's assets to the foreign representative. There are two forms of discretionary entrustment a court can order under § 1521. Section 1521(a)(5) permits the court to order "entrusting the administration or realization of all or part of the debtor's assets" in the United States to the foreign representative. 11 U.S.C. § 1521(a)(5). "Incident to the task of administering and realizing assets of the debtor within the U.S. is the need to obtain affirmative control over such assets. It may be necessary to obtain turnover of assets in the hands of third parties." Clark, § 7[2], at 73.

In addition, under § 1521(b), the foreign representative may be entrusted with "the distribution of all or part of the debtor's assets located in the United States." 11 U.S.C. § 1521(b). Section 1521(b) cautions that this relief only be granted if the interests of local creditors are "sufficiently protected." *Id.*[10] One court has described "sufficient protection" as embodying three basic principles: "the just treatment of all holders of claims against the bankruptcy estate, the protection of U.S. claimants against prejudice and inconvenience in the processing of claims in the [foreign] proceeding, and the distribution of proceeds of the [foreign] estate substantially in accordance with the order prescribed by U.S. law." *In re Artimm*, 335 B.R. at 160 (analyzing under § 304(c) of the old Code, but noting that the analysis would be "essentially the same" under § 1521(b)). In other words, § 1521(a)(5) allows the foreign representative to collect property in the

---

[10] The Code uses the term "sufficiently protected" to distinguish § 1521(b) from "adequate protection" under § 361.

United States, and § 1521(b) allows the foreign representative to distribute the property in the foreign case, provided that creditors in the U.S. are sufficiently protected pursuant to § 1521(b) and § 1522(a).

In addition to § 1521's provisions regarding "any appropriate relief," § 1507(b) provides that a court, "[i]n determining whether to provide additional assistance . . . shall consider whether such *additional assistance*, consistent with the principles of comity, will reasonably assure—

> (1) just treatment of all holders of claims against or interests in the debtor's property;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns."

11 U.S.C. § 1507(b) (emphasis added).  These provisions embody the protections previously contained in § 304 with one critical exception: the principle of comity was removed as one of the factors and elevated to the introductory paragraph.  The legislative history confirms that the principle of comity was placed in the introductory language to § 1507 to emphasize its importance.  *See United States v. J.A. Jones Constr. Group, LLC*, 333 B.R. 637, 638 (E.D.N.Y. 2005) (citing legislative history); *see also* Gropper, at 3–4 (noting that in light of the elevation of comity to the introductory paragraph of § 1507, and the legislative history of chapter 15, courts will likely consider precedent under § 304 in fashioning appropriate relief).

The interplay between the relief available under §§ 1507 and 1521 is far from clear.  Nevertheless, the legislative history confirms that Congress expected courts to interpret the provisions consistently with prior law under § 304.  Indeed, while "[i]t is clear that Congress did not intend merely to continue § 304 unchanged[,] . . . the legislative history of § 1521 states that the section does not expand 'the scope of relief' currently available under § 304."  Gropper, at 4 (citing H.R. REP. NO. 109-031, at 116 (2005)).  As Judge Gropper notes, the language in § 1507 permitting the court to grant "*additional assistance*" to the trustee is different from the language in § 1521 allowing the court to fashion "*any appropriate relief*" to fit the circumstances of the case.[11] Gropper, at 2–3.  Whatever the outer bounds of discretionary relief chapter 15 allows, this case does not push the boundaries.  The relief sought by the foreign representative is expressly provided for in §§ 1521(a)(5) and 1521(b).  The Court need not venture into the area of "additional assistance," "consistent with principles of comity" under § 1507.

As noted above, before the Court can order turnover of the funds to the foreign representative for administration in the foreign bankruptcy proceeding under § 1521(b), the Court must conclude that domestic creditors are sufficiently protected.  In this case, there are no U.S. claimants; each of the creditors that obtained a Rule B attachment is a

---

[11]    This distinction also resolves the Objecting Creditors' argument that Congress limited the Court's discretion to grant comity to foreign proceedings.  Section 1507(a) provides that the Court may grant additional relief to the foreign representative consistent with principles of comity, "[*s]ubject to the specific limitations stated elsewhere in this chapter . . . .*" 11 U.S.C. § 1507(a) (emphasis added).  The Objecting Creditors argue that this language specifically refers to the avoidance action carve-outs in §§ 1521(a)(7) and 1523(a), and thus Congress has explicitly limited the Court's discretion to grant the requested relief through comity to a foreign proceeding.  *See Maxwell Commc'ns Corp. v. Societe General (In re Maxwell Commc'ns Corp.)*, 93 F.3d 1036, 1047 (2d Cir. 1996) ("Because the principle of comity does not limit the legislature's power and is, in the final analysis, simply a rule of construction, it has no application where Congress has indicated otherwise.") (citing *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959)).  But as noted above, Congress used the term "additional assistance" in § 1507 to distinguish it from the "any appropriate relief" available under § 1521.  The legislative history makes clear that "[section 1507] is intended to permit the further development of international cooperation begun under section 304, *but is not the basis for denying or limiting relief otherwise available under this chapter.*"  H.R. REP. NO. 109-31, pt. 1, at 109 (2005) (emphasis added).

22

foreign creditor. Their claims have no connection to the United States, other than their success in garnishing Atlas' funds in banks in New York through Supplemental Rule B attachments in support of the creditors' London arbitrations against Atlas. "[T]he traditional policy underlying maritime attachment has been to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant to satisfy a judgment." *Aqua Stoli*, 460 F.3d at 443. When a foreign bankruptcy proceeding—recognized as a foreign main proceeding under chapter 15 of the Bankruptcy Code—is pending, and it provides a forum for all creditors seeking to satisfy their claims against a foreign debtor, plaintiffs such as the creditors in this case *have* a proper forum available to them and they are not left to scour the globe for the debtor's assets. That these creditors may be denied an advantage over the debtor's other previously unsecured creditors is not a valid reason to deny relief to the foreign representative. As explained below, the Court concludes that §§ 1521(a)(5) and 1521(b) provide the necessary authority for this Court, consistent with principles of comity, to grant the relief requested by Atlas' foreign representative.

With respect to whether the funds should turned over to the foreign representative, *Tri-Continental*, 349 B.R. 627, offers a useful approach for resolving § 1521(a)(5) disputes and also provides some guidance here. There, one of the debtor's creditors had a prepetition judgment lien against the debtor's funds that were the subject of an *in rem* proceeding, and the creditor objected to the entry of § 1521(a)(5) relief that would have entrusted the foreign representative with administering and realizing those funds.[12] 349 B.R. at 635−36. The court overruled the objection on two grounds. First,

---

[12] The foreign representative in *Tri-Continental* did not seek § 1521(b) relief.

the court held that because the foreign representative was not seeking § 1521(b) relief, there was no risk of the funds leaving the court's jurisdiction. *Id.* at 639. Second, depriving the foreign representative of funds that he may realize in the United States would not further the goals of chapter 15. *Id.* The court therefore granted the foreign representative authority to administer and realize assets in the United States. *Id.*

Here, the foreign representative seeks both forms of turnover relief under § 1521. The Court concludes that § 1521(a)(5) and § 1521(b) provide sufficient grounds to award such relief. In this case, if the garnished funds are released to the foreign representative, she proposes to remove the funds from the United States. She can be permitted to do so under § 1521(b), with the creditors protected by making those funds subject to administration by the bankruptcy court in Denmark. The foreign representative acknowledged during the March 25, 2009 hearing that if the relief is granted, it is without prejudice to creditors' rights, if any, to assert in the Danish bankruptcy court their rights to the previously garnished funds. This is sufficient protection to the creditors here. *See In re Milovanovic*, 357 B.R. at 257 (ordering funds transmitted abroad over objection of an attaching creditor where creditors' rights in the foreign proceedings were reserved). The Court further concludes that ordering turnover would be more economical and efficient in that it would permit all of Atlas' creditors worldwide to pursue their rights and remedies in one court of competent jurisdiction.

### 4. Discretionary Relief – Limits on Avoidance Actions

The inquiry does not necessarily end there. The Objecting Creditors argue that the Court's discretion to grant comity to the Danish proceeding is limited by language in § 1521 that prohibits the foreign representative from initiating avoidance actions in a

chapter 15 case. The Court finds the argument unpersuasive. First, the foreign representative here has not initiated avoidance actions, so that language is not implicated in this case. Second, the Court grounds its ruling in § 1521(a)(5) and § 1521(b), which expressly provide for the relief granted here with no such limitation.

Section 1521(a)(7) carves out avoidance powers under §§ 544, 547 and 548, which are only available to the trustee in a full case under another chapter.[13] *See* Clark, § 7[2], at 73; 8 COLLIER'S ON BANKRUPTCY ¶ 1521.02 (15th rev. ed. 2009). Section 1523(a) grants the foreign representative the powers of a trustee to bring avoidance actions only in full bankruptcy cases under another chapter of the Code. 11 U.S.C. § 1523(a). The only court that appears to have addressed in a published opinion the scope of the avoidance action carve-out is the district court in *Fogerty v. Condor Guaranty, Inc. (In re Condor Ins. Ltd (In Official Liquidation))*, slip copy, 2009 WL 321627 (S.D. Miss. Feb. 9, 2009). In *Condor*, the foreign representative of a Nevis-incorporated insurance company initiated an adversary proceeding seeking to avoid pre-chapter 15-petition fraudulent transfers by some of the debtor's principals. The transferred assets were located in the United States. The district court affirmed the bankruptcy court's decision granting the defendants' motion to dismiss for lack of subject matter jurisdiction on the grounds that § 1521(a)(7) and § 1523(a) do not give a foreign representative the authority to bring avoidance actions. *Id.* at *3. The foreign representative contended that the fraudulent conveyance action was seeking relief under Nevis law rather than under Bankruptcy Code § 548 and, therefore, the exclusion of avoidance powers under § 548

---

[13] Section 1521(a)(7) provides that the court may grant any additional relief that may be available to a trustee, "except for relief available under sections 522, 544, 545, 547, 548, 550 and 724(a)." Therefore, to gain these avoidance powers, the foreign representative must commence a case under chapters 7 or 11.

contained in §§ 1521(a)(7) and 1523 in the absence of a case under chapters 7 or 11 (which could not be commenced on behalf of a foreign insurance company that did not conduct business in the U.S.) did not apply. The court rejected the argument that the plain language of the Code sections only precluded a foreign representative from obtaining relief under the Bankruptcy Code's statutory avoidance sections, concluding instead that §§ 1521(a)(7) and 1523 are ambiguous because "the plain language of the statute does not specifically address the use of avoidance powers under foreign law. Nevertheless, the choice of law that is to be applied to a lawsuit is determined by a court having jurisdiction over the case . . . ." *Id.* The court looked to legislative history and concluded that without a case under chapters 7 or 11, it lacked jurisdiction over the adversary proceeding. The court emphasized that §§ 1521(a)(7) and 1523 "are intended to exclude all of the avoidance powers specified, *under either United States or foreign law*, unless a Chapter 7 or 11 bankruptcy proceeding is instituted." *Id.* at *4 (emphasis added). It therefore dismissed the petition.

In *dicta*, the court also noted that the foreign representative could seek avoidance in the foreign jurisdiction and then seek recognition of the foreign order here. *Id.* at *3 n.6 (citing *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333 (S.D.N.Y. 2006)). *Ephedra* involved a chapter 15 proceeding in which the foreign representative moved to recognize and enforce in the United States a claims resolution procedure ordered by an Ontario court, even though the procedure arguably deprived parties of the constitutional right to a jury trial. *Ephedra*, 349 B.R. at 334−35. In recognizing the order, the district court ruled that the public policy exception embodied in § 1506 should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the

most fundamental policies of the United States." *Id.* at 336 (citing H.R. REP. NO. 109-31(I) at 109, *reprinted in* 2005 U.S.C.C.A.N. 88, 172).

While the parties relied extensively on *Condor* in briefing, the Court concludes that its reasoning is open to question and it is in any event inapplicable to this case since the foreign representative has not commenced an avoidance action under U.S. or foreign law. The *Condor* court's conclusion that Congress intended to prevent a foreign representative from bringing avoidance actions based on foreign law is not supported by anything specifically in the legislative history. The court also ignores cases decided under § 304. *See, e.g.*, *In re Metzeler*, 78 B.R. 674, 677 (Bankr. S.D.N.Y. 1987) (holding "that a foreign representative may assert, under § 304, only those avoiding powers vested in him by the law applicable to the foreign estate"). As the court in *Metzeler* stated, Congress is presumed not to have overturned precedent when amending the Bankruptcy Code. *Id.* at 679.[14] The court also noted that "Congress intended that foreign preference and fraudulent transfer actions seeking to recover property located here are a sufficient basis on which to ground a § 304 petition . . . ." *Id.* at 680.[15] Similarly here, absent a

---

[14]    In addition, Congress also expected courts to look at § 304 case-law in interpreting chapter 15.

[15]    *See also* 2 COLLIER ON BANKRUPTCY ¶ 304.06, at 304-25 (15th rev. ed. 2009) (footnotes omitted):

> Despite the suggestion of some early cases to the contrary, it is clear that section 304(b)(2) does not vest the foreign representative with the authority to commence avoidance actions under the powers granted a bankruptcy trustee in a plenary case commenced under the Bankruptcy Code. Thus, a foreign representative may not, in a case under section 304, assert claims for the turnover of money or property of the debtor under sections 542, 543, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code.
> On the other hand, section 304(b)(2) permits a bankruptcy court to act as a forum for the assertion in the United States of avoiding powers and similar causes of action that are vested in the foreign representative under otherwise applicable law. Thus, a foreign representative may assert in a section 304 case claims for the turnover of property or assets that arise under the law of the foreign jurisdiction whence the foreign representative comes. But before a foreign representative will be allowed to maintain such a cause of action, the

clear statutory directive, it is unclear whether chapter 15's replacement of § 304 precludes a foreign representative from bringing an avoidance action under foreign law. The Court need not decide that issue here.[16]

More important for this case, *Condor* did not deal with issues concerning comity to a foreign bankruptcy proceeding. Indeed, as noted above, in a footnote, the court suggested that it would recognize under principles of comity a foreign avoidance order. 2009 WL 321627, at *3 n.6. The *Condor* court resolved a motion to dismiss an adversary proceeding the foreign representative had already initiated; here, the Court must decide what, if any, discretionary relief the foreign representative should be granted.

Notwithstanding the different procedural posture of this case, the Objecting Creditors argue that the carve-out for avoidance actions in §§ 1521(a)(7) and 1523 prevents Atlas' foreign representative from obtaining the relief she seeks, contending that the only way to dissolve the Rule B attachments is through a § 547 preference avoidance action in a case under chapters 7 or 11. This argument fails, however, because it hinges on equating vacating the Rule B attachments (and requiring the parties to litigate their rights in Denmark) with avoiding a transfer of debtor's property under § 547. The creditors cite no authority that the only way to dissolve a Rule B attachment is through an avoidance action. Specifically, they fail to show why the requested relief—entrusting the

---

bankruptcy court will be required to determine whether to grant the relief after having weighed the factors prescribed by section 304(c).

[16]    Neither *Metzeler* nor *Condor* address whether a fraudulent conveyance claim applying foreign law would need to be brought under § 544(b)(1), where the foreign law would be the "applicable law" under that section. The Court's research failed to locate any authority addressing whether "applicable law" includes foreign law. Sections 1521(a)(7) and 1523(a) specifically exclude a chapter 15 foreign representative's avoidance power under § 544 unless a case under chapters 7 or 11 is commenced. Section 544(b) gives the trustee the standing of a judgment lien creditor; a preference action under foreign law would not appear to depend on status as a judgment lien creditor and, therefore, § 544(b) would appear inapplicable to such claims. A preference action under foreign law might be available as "additional assistance" under § 1507.

previously garnished funds to the foreign representative for administration by the Danish bankruptcy court—cannot be ordered under §§ 1521(a)(5) and 1521(b). The Objecting Creditors' rights, if any, are not being avoided; rather, whether they have superior claims to the previously garnished funds will be for the Danish court to decide. The Objecting Creditors' argument is also belied by their motives: it appears that their strategy is to try to avoid the reach of both this Court and the Danish court to further enhance their leverage in negotiations with Atlas or to provide an avenue to recover their claims in full.[17] Either way, even if the Court were to countenance such blatant gamesmanship— and the Court declines to decide issues of U.K. or Danish law—this strategy is probably fatally flawed.[18]

---

[17] The Objecting Creditors' strategy became clear during the March 25, 2009 argument. First, they argue that this Court cannot vacate the Rule B attachments absent an adversary proceeding brought in a case under chapters 7 or 11, claims that could no longer be timely brought within the 90-day preference period. Second, the Objecting Creditors contend that the Danish bankruptcy court does not have personal jurisdiction over them and, thus, any stay issued by the Danish court cannot prevent them from proceeding with their London arbitrations, which they plan to do. Third, they argue that the automatic stay applicable in this chapter 15 case extends only to debtors' property in the U.S. and not to the London arbitrations. Fourth, if they are successful in obtaining arbitration awards in London, the creditors will obtain English judgments on the arbitration awards. And finally, fifth, the creditors will then return to the district court in New York seeking recognition and enforcement of the English judgments against the assets that have been garnished under the Rule B attachments. In this fashion, they hope to circumvent the jurisdiction of the Danish bankruptcy court and this Court, and to recover the entire amount of their claims while other Atlas creditors who file claims in the Danish bankruptcy proceeding may recover substantially less.

[18] The Court has doubts about the efficacy of each step of the Objecting Creditors' strategy. The argument that the Danish court has no personal jurisdiction is questionable, but it is one for the Danish or U.K. courts to decide. *See Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V.*, 108 F. Supp. 2d 349, 354 (S.D.N.Y. 2000) ("Every person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government . . . . To all intents and purposes, he submits his contract with the corporation to such a policy of the foreign government . . . .") (citing *Canada S. R.R. Co. v. Gebhard*, 109 U.S. 527, 537-38 (1883)); *Sinatra v. Gucci (In re Gucci)*, 309 B.R. 679, 684 (S.D.N.Y. 2004) (holding that since property is located in foreign jurisdiction, it is for that court to decide its fate). Their ability to obtain English judgments on potential London arbitration awards seems questionable in light of U.K. principles of cross-border insolvency distribution. *See in re HIH Casualty & Gen. Ins. Ltd.*, [2008] 1 W.L.R. 852, 861-62 (2008), [2008] UKHL 21, 2008 WL 833632 ("English courts should, so far as is consistent with justice and U.K. public policy, cooperate with the courts in the country of principal liquidation to ensure that all the company's assets are distributed to its creditors under a single system of distribution."). And the plan to return to the district court in New York to seek recognition of the foreign judgments against the assets garnished under the Rule B attachments is problematic under the Second Circuit's decision in *Victrix. Victrix*, 825 F.2d at 715.

Ordering entrustment of the previously garnished funds to the foreign representative does not fall within the ambit of the avoidance action carve-out in §§ 1521(a)(7) and 1523, because, as discussed above, it is properly considered turnover relief under §§ 1521(a)(5) and 1521(b).  A judgment in an avoidance action results in an order that the creditor may not retain an interest in debtor's property.  *See* 11 U.S.C. § 551 (avoided transfers are retained for the benefit of the estate); 5 COLLIER'S ON BANKRUPTCY ¶ 551.02[2], at 551-6 (15th rev. ed. 2009).  The Court does not make such a determination here.

D.      *Section 543 Does Not Apply in Chapter 15 Cases*

Lastly, in addition to the relief provisions under chapter 15, the foreign representative also argues that § 543's turnover provisions apply here and require the custodian banks to turnover restrained funds to the trustee.  Section 101(11)'s definition of custodian includes anyone authorized by contract or law to take charge of the debtor's property for the purpose of enforcing a lien.  11 U.S.C. § 101(11)(C); 5 COLLIER'S ON BANKRUPTCY ¶ 543.01[1] (15th rev. ed 2009).  That definition encompasses a garnishee bank that has restrained the debtor's funds.  *See Barr v. Juniata Valley Bank* (*In re DeLancey*), 77 B.R. 424, 429 (Bankr. S.D.N.Y. 1987) (noting that under § 543(b), an escrow agent subject to a writ of attachment has an obligation to turn over the funds to the trustee).  In a typical chapter 7 or 11 case, therefore, a garnishee bank would have to turn over restrained funds to the debtor pursuant to § 543(b).  Relying on *DeLancey*, the foreign representative argues that the same result should follow here.

But Chapter 15 is silent as to whether § 543's mandatory turnover requirements apply in the chapter 15 context, and the discretionary nature of § 1521's turnover

provisions suggests that the mandatory obligations of § 543 should not apply in the chapter 15 context. Otherwise, there would be a conflict between the discretionary turnover provisions under § 1521, on the one hand, and the mandatory turnover requirement in § 543, on the other hand. The Court adopts the view that § 1521 overrides the mandatory obligations under § 543, because if § 543 applied, § 1521 would appear to have no purpose.[19]

## CONCLUSION

For the reasons explained above, the Court grants the foreign representative the following additional relief:

1. The Supplemental Rule B attachments obtained by the following creditors in the United States District Court for the Southern District of New York are hereby vacated: Dormin Shipping, Limankoy, Amanda Navigation, Sertio Shipping, Allied Maritime, New Era Shipping, Cargill International, Peninsula Petroleum, Malena Shipping.

2. Atlas's foreign representative shall take possession of the funds that were subject to the Supplemental Rule B attachments (which funds are currently held in escrow by the foreign representative's U.S. counsel); provided, however, that such funds are hereby subjected to the jurisdiction and administration of the Danish bankruptcy court in the pending Atlas proceedings.

3. "It will then be up to the [Danish] court to determine what benefit, if any, [these creditors] should enjoy from having obtained" the Rule B attachments. *Victrix*, 825 F.2d at 715.

---

[19]    In addition, the foreign representative also argues that the bankruptcy court's decision in *In re Syrria Adomah*, 340 B.R. 453 (Bankr. S.D.N.Y. 2006), *aff'd*, 368 B.R. 134 (S.D.N.Y. 2007), supports the proposition that the automatic stay voided the Rule B maritime attachment liens at the time the chapter 15 petitions were filed. In *Adomah*, the debtor filed a chapter 7 bankruptcy after Mitsubishi served a restraining notice on the debtor's bank. The debtor moved to vacate the restraining notice. The court concluded that "[u]pon the filing of the petition, the restraining notice became void and of no effect." *Id.* at 458. *Adomah* involved a restraining notice rather than a Rule B lien, and the holding of the case specifically indicated that it was limited to a restraining notice and not a lien. *Id.* at 458 n.3. The Court declines to apply *Adomah* in resolving this case.

**IT IS SO ORDERED.**

DATED:      April 27, 2009
              New York, New York


                              **/s/Martin Glenn**
                                  MARTIN GLENN
                    United States Bankruptcy Judge